IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Gordon P. Gallagher, United States Magistrate Judge

Criminal Case No.  20-PO-07016-GPG

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DAVID LESH,

      Defendant.

## MEMORANDUM OF DECISION AND ORDER

This matter was tried to the Court on August 5, 2021.  (D. 89).[1]  Defendant is charged by Superseding Information[2] with two counts:  (1) on or about April 24, 2020, operation of a snowmobile off a designated route upon lands administered by the United States Forest Service, in violation of 36 C.F.R. § 261.14; and (2) on or about April 24, 2020, through October 21, 2020, selling or offering for sale any merchandise or conducting any kind of work activity or service without authorization upon lands administered by the United States Forest Service, in violation of 36 C.F.R. § 261.10(c).  (D. 53).  I find Defendant GUILTY of Count 1 and Count 2.

---

[1]  "(D. 89)" is an example of the stylistic convention used to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF).  This convention is used throughout this Order.

[2] This Court has already detailed the facts and procedural history of this case in its prior Order and will not do so here.  (*See* D. 61).

1

The offenses charged are Class B misdemeanors, which are petty offenses. 18 U.S.C. § 19. As such, there is no right to a jury trial. Fed. R. Crim. P. 58(b)(2)(F). At the conclusion of the bench trial, this Court informed the parties that it would issue a Memorandum of Decision and Order containing specific findings of fact consistent with the provisions of Federal Rule of Criminal Procedure 23(c). (D. 89, pp. 247-48); *see United States v. Unser*, 165 F.3d 755, 760 n.3 (10th Cir. 1999).

First, under 36 C.F.R. § 261.14:

> After National Forest System roads, National Forest System trails, and areas on National Forest System lands have been designated for over-snow vehicle use pursuant to 36 CFR 212.81 on an administrative unit or a Ranger District of the National Forest System, and these designations have been identified on an over-snow vehicle use map, it is prohibited to possess or operate an over-snow vehicle on National Forest System lands in that administrative unit or Ranger District other than in accordance with those designations, provided that the following vehicles and uses are exempted from this prohibition:
> (a) Limited administrative use by the Forest Service;
> (b) Use of any fire, military, emergency, or law enforcement vehicle for emergency purposes;
> (c) Authorized use of any combat or combat support vehicle for national defense purposes;
> (d) Law enforcement response to violations of law, including pursuit;
> (e) Over-snow vehicle use that is specifically authorized under a written authorization issued under Federal law or regulations; and
> (f) Use of a road or trail that is authorized by a legally documented right-of-way held by a State, county, or other local public road authority.

Second, 36 C.F.R. § 261.10(c), prohibits "[s]elling or offering for sale any merchandise or conducting any kind of work activity or service unless authorized by Federal law, regulation, or special-use authorization." This subsection of the regulation does not state that the person or entity must be on National Forest System lands.

I.   FACTS

I find the following facts to be true beyond a reasonable doubt:

(1) The Keystone Resort, in April 2020, was closed due to the COVID-19 pandemic, per decisions by Vail Resorts and a state-wide directive issued by Governor Polis.

(2) The Keystone Resort is on National Forest Service lands (NFS lands) within the White River National Forest in the state of Colorado.

(3) NFS lands are the property of the United States of America.

(4) In March 2020, employees, using plows attached to snowcat utility vehicles, created snow barriers in front of the terrain park features to make them inaccessible. Employees posted signs around the Keystone Resort indicating that the ski areas and terrain park were closed. Employees conducted weekly patrols of the entire area to ensure buildings were secure and signage was visible and in place.

(5) On April 25, 2020, Christopher Ingham, the Director of Mountain Operations for Keystone Resort, was alerted to two photographs that were posted on Defendant's Instagram account that same day.

(6) Defendant owns a small outdoor apparel company called Virtika.

(7) Defendant's Instagram account bears the username "davidlesh," which maintains a blue verification badge issued by Instagram to accounts that are the authentic presence of public figures, celebrities, or global brands or entities it represents.[3]

(8) The first image, posted on April 25, 2020, in a series of two, depicts an individual wearing outdoor apparel consisting of dark-colored pants, a camouflage jacket, and a dark-colored ski cap, jumping a red and black snowmobile off a jump at the Keystone

---

[3] I take judicial notice of Instagram's definition for a verified badge on an Instagram account. *See Verified Badges*, https://help.instagram.com/854227311295302 (last visited Oct. 21, 2021).

Resort in April of 2020.  A second individual, wearing a dark-colored ski bib and white shirt, stands on the ski jump and is in the process of taking a photograph or filming. The first photograph was taken either using a tripod stand or a third person.

(9) The second image, posted on April 25, 2020, is of the same individual on the red and black snowmobile but from a different perspective.

(10) The caption for the photographs posted on April 25, 2020, on Defendant's Instagram account states: "Solid park sesh, no lift ticket needed."  Before or on August 3, 2021, Defendant edited the caption to state: "Solid park sesh, no lift ticket needed. #FuckVailResorts."

(11) At approximately 9:00 a.m., on April 25, 2020, Ingham drove a snowcat (which has wider and larger tracks than a snowmobile with a 20-feet-by-30-feet overall footprint) to the terrain part at the Keystone Resort and found snowmobile tracks looping around a ski jump.  Ingham observed and photographed these tracks.  Ingham noted that employees were not using snowmobiles during the closure of the resort in April 2020, the vehicle maintenance shop that housed the access keys for those vehicles was locked at this time, and employees exclusively relied upon snowcat utility vehicles and other tractor-type utility vehicles to patrol and maintain the grounds of the Keystone Resort.

(12) Ingham also observed that a utility shed about a hundred yards above the ski jump had been entered and a snow shovel had been removed.  The snow shovel was used to clear a channel in the snow berm that had been created to block access to the ski jump.  The channel was approximately five feet wide, which was enough for a snowmobile to ride through.

(13) Ingham noted that the tracks indicated that more than one jump had taken place and that, in addition to using the ski jump, the tracks indicated that snowmobiling had occurred around the resort, terrain park, through an area called Erickson Bowl, and down a trail on the NFS lands.

(14) On June 10, 2020, and October 21, 2020, two more images depicting Defendant standing in protected bodies of water on NFS lands, namely Hanging Lake and Maroon Lake, were posted to the davidlesh Instagram profile. The Government does not argue that these photographs are authentic.

(15) On January 11, 2021, an article entitled "Trolling the Great Outdoors" by Nick Paumgarten was published in The New Yorker, a national weekly publication.

(16) The author of the article states:

   a. "Lesh decided to poke the bear. He posted a couple of photos of him snowmobiling off a jump in a closed terrain park at the Keystone ski area, which, like Breckenridge, is operated by the company that owns Vail ski resort, on land belonging to the Forest Service."

   b. "Lesh declined to reveal Virtika's annual sales, though he claimed they were up thirty per cent since he'd posted the photo at Hanging Lake; he said he owns the company outright and carries very little debt."

(17) Defendant is quoted in the article saying:

   a. "But, me being a little guy, it's not interesting or unique. You're not getting noticed being super 'eco this' and 'eco that.' It's also just not my thing."

   b. "Here I am—or supposedly me—with one misdemeanor, in a terrain park, and everyone goes nuts. It's absolutely ridiculous."

    c. "The more hate I got, the more people got behind me, from all over the world," Lesh said. "These people couldn't give two fucks about me walking on a log in Hanging Lake. It was an opportunity to reach a whole new group of people—while really solidifying the customer base we already had."

    d. Regarding the images of Hanging Lake and Maroon Lake: "I wanted them to charge me with something. The only evidence they have is the photos I posted on Instagram, which I know are fake, because I faked them. I was pissed off about them charging me for the snowmobiling on Independence Pass with zero evidence. I realized they are quick to respond to public outcry. I wanted to bait them into charging me."

    e. "I want to be able to post fake things to the Internet. That's my fucking right as an American."

(18) Defendant does not state that the Keystone Resort images posted on April 25, 2020, are photoshopped.

(19) Defendant later appeared on the Vance Crowe Podcast. When asked about The New Yorker article, Defendant responded that "nothing that he [the author of the article] said was untrue or unfair, but it only captures one aspect of me, one part of my life, one part of our marketing, one part of my company."

## II.    ANALYSIS

There are two disputes in this case, whether: (1) Defendant is the person riding the snowmobile at the Keystone Resort in April 2020, and (2) Defendant's post regarding the Keystone

Resort constitutes the selling or offering for sale any merchandise or conducting unauthorized work activity or service on NFS lands.[4]

The Government does not argue that the Hanging Lake and Maroon Lake photographs are authentic, thus I will not consider the photographs as separate violations of the second count because the Government does not argue that Defendant was on NFS lands when these photographs were created or taken. Rather, the Government argued that the Hanging Lake and Maroon Lake photographs were offered to show that Defendant continued to promote his business with controversial photographs depicting NFS lands and were relevant as *res gestae*. At most, the Hanging Lake and Maroon Lake photographs can be considered evidence of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. *See* Fed. R. Evid. 404(b)(2); *see United States v. Sangiovanni*, 660 F. App'x 651, 655 (10th Cir. 2016) (finding that the district court did not abuse its discretion in admitting two photographs of the defendant that he emailed to the victim, which depicted him holding a firearm). Furthermore, Rule 404(b) applies "only to prior bad acts extrinsic to the crime charged." *United States v. Kravchuk*, 335 F.3d 1147, 1155 (10th Cir. 2003).

This Court is persuaded in particular by Government exhibits numbers 4 through 7. These exhibits consist of photographs showing snowmobile track marks in the snow from a person snowmobiling off of a ski jump at the Keystone Resort and that were taken on the morning of April 25, 2020. Of particular importance, the Government provided testimony that resort

---

[4] Generally, courts have found that a violation of Forest Service regulations to be a public welfare offense and lacks a *mens rea* requirement. *See United States v. Unser*, 165 F.3d 755, 763-74 (10th Cir. 1999) (finding that violations of 16 U.S.C. § 551 and 36 C.F.R. § 261.16(a) do not have a required *mens rea* element). Accordingly, for such offenses, courts impose strict liability without a scienter requirement. *Id.*; *see also United States v. Good*, 257 F. Supp. 2d 1306, 1318 (D. Colo. 2003) (finding violations of 36 C.F.R. §§ 261.9(a) and 261.10(a) are public welfare offenses); *United States v. Ellison*, 112 F. Supp. 2d 1234, 1235, 1237 (D. Colo. 2000) (finding the defendant's violation of 36 C.F.R. § 261.10 to be a strict liability offense). The Court, as discussed *infra*, does not need to reach a conclusion regarding the violations in this case and strict liability because the evidence supports an inference that Defendant knew he was on NFS lands. *See United States v. Brown*, 200 F.3d 710, 715 (10th Cir. 1999).

employees were neither using nor had access to snowmobiles during the time that the resort was closed due to the COVID-19 pandemic. Rather, the employees were using large snowcats and tractor utility vehicles to patrol the resort and construct the berms blocking access to the ski jumps. Furthermore, employees were patrolling the Keystone Resort on a weekly basis. Thus, on or about April 24, 2020, one or more persons had to bring a snowmobile into the terrain park, clear the artificially made snow mounds blocking the ski jump using the snow shovel in the utility shed, and then joy ride around the resort and jump off the ski jumps. The discovery and existence of track marks in the terrain park on April 25, 2020, which was the same day that Defendant posted the photographs on his social media account, indicates that the photographs are authentic. Indeed, Defendant never argued that the Keystone Resort photographs were photoshopped.

      This Court is also persuaded by Government exhibits numbers 9 and 13. Exhibit 9 is the article published in The New Yorker magazine. In the article, the author places Defendant on the snowmobile, writing "[h]e posted a couple of photos of him snowmobiling off a jump in a closed terrain park at the Keystone ski area." Nevertheless, this statement by the author alone does not prove identity. Defendant is directly quoted in the article stating, "[h]ere I am—or supposedly me—with one misdemeanor, in a terrain park, and everyone goes nuts. It's absolutely ridiculous." Exhibit 13 consists of a short segment of a podcast interview. At the start of the podcast, Defendant confirmed that "nothing that he [the author of the article] said was untrue or unfair, but it only captures one aspect of me, one part of my life, one part of our marketing, one part of my company." Defendant noted that the article could not be a "fluff piece" and therefore other aspects of his life and company were not included. The question is whether Defendant manifested an adoption or belief in the truth of the statements in The New Yorker article. This Court finds that he did. During the bench trial, the Court determined that Defendant's statements within the article and podcast

8

were not inadmissible hearsay under Federal Rule of Evidence 801(d)(2)(B). *See United States v. Harrison*, 296 F.3d 994, 1001 (10th Cir. 2002). Furthermore, the Tenth Circuit has noted:

> In view of our decision to reverse the district court's determination with respect to the fraud issue, we must examine plaintiff's claim that the district court improperly refused to admit into evidence certain reprints of newspaper articles that were delivered by defendants to plaintiff's decedent. The reprints make statements about defendants' financial situation that are claimed to be inflated representations relevant to the fraud inquiry. In the first trial the district court ruled that these newspaper reprints were inadmissible as hearsay. This decision was incorrect. Fed.R.Evid. 801(d)(2) provides that a statement is not hearsay if it is offered against a party and is "a statement of which he has manifested his adoption or belief in its truth." By reprinting the newspaper articles and distributing them to persons with whom defendants were doing business, defendants unequivocally manifested their adoption of the inflated statements made in the newspaper articles.

*Wagstaff v. Protective Apparel Corp. of Am.*, 760 F.2d 1074, 1078 (10th Cir. 1985). Here, Defendant went beyond merely reprinting an article and distributing it, rather he appeared on a podcast and verbally confirmed that nothing written by the author was "untrue or unfair." Defendant did not contend that the author had misquoted him or improperly insinuated that Defendant was the individual operating the snowmobile in the Keystone Resort.

With the combination of circumstantial evidence plus Defendant's adoption or belief in the truth of the article's statements, this Court finds beyond a reasonable doubt that Defendant possessed or operated an over-snow vehicle on NFS lands on or about April 24, 2020, that such operation or possession of an over-snow vehicle was outside of the roads, trails, and areas designated for over-snow vehicle use because the Keystone Resort was closed due to the COVID-19 pandemic and the terrain park was not a designated route[5], and that defendant's conduct did not fall within any of the regulatory exemptions under 36 C.F.R. § 261.14(a)-(f).

---

[5] Defendant argued that under 36 C.F.R. § 261.14, the Government failed to prove an element of its case, namely that the NFS lands needed to be identified on an over-snow vehicle use map and that the Government did not provide evidence of such required designations by furnishing a map as an exhibit. The Court denied Defendant's motion for judgment of acquittal under Rule 29, finding that the Keystone Resort is not an area of NFS lands that has been designated for over-snow vehicle use and therefore a map did not need to be furnished, the resort and terrain park were closed due to the COVID-19 pandemic, signage of the closure was placed throughout the resort and terrain park, and employees of the resort had created snow berms to prevent

There is no dispute that Defendant then posted the June 10, 2020, photo of Hanging Lake and October 21, 2020, photo of Maroon Lake. Defendant conceded this. Defendant stated in The New Yorker article, "I wanted them to charge me with something. The only evidence they have is the photos I posted on Instagram, which I know are fake, because I faked them. I was pissed off about them charging me for the snowmobiling on Independence Pass with zero evidence." While the Government did not argue that the Hanging Lake and Maroon Lake photographs were authentic, it did argue that they show that Defendant continued to promote his business with photographs that depicted NSF lands.

Under 36 C.F.R. § 261.10(c), a person is prohibited from "[s]elling or offering for sale any merchandise or conducting any kind of work activity or service unless authorized by Federal law, regulation, or special-use authorization." To be found guilty of violating § 261.10(c), the Government must prove: (1) that the defendant was "conducting any kind of work activity or service"; (2) that was "on lands encompassed by the regulation"; and (3) that was "without a special use authorization." *United States v. Parker*, 761 F.3d 986, 993 (9th Cir. 2014). Defendant challenged only the first two elements.

Regarding the first element, the Tenth Circuit has noted that "[r]eceipt of payment, however, is not a required element under § 261.10(c). The key is whether the sale or offer of sale of merchandise or the work activity or service is a commercial activity." *United States v. Brown*, 200 F.3d 710, 714 (10th Cir. 1999) (listing cases). Noncommercial or gratuitous activities (i.e., uncompensated aid to a friend) are not the target of § 261.10(c). *United States v. Bartels*, No.

---

trespassers from using the terrain park during the closure. Therefore, it was abundantly clear to a reasonable person that these NFS lands were not designated for over-snow vehicle use. Regardless, because the winter motor vehicle use map is publicly available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd491314.pdf, I take judicial notice of it, which notice may be taken at any time including on appeal. *United States v. Burch*, 169 F.3d 666, 671-72 (10th Cir. 1999) ("[O]fficial government maps are generally an acceptable source for taking judicial notice."); *see Klamath-Siskiyou Wildlands Ctr. v. Gerritsma*, 638 F. App'x 648, 655 n.4 (9th Cir. 2016). Accordingly, Defendant's argument is unavailing.

F053881, 1998 WL 289231, at *4 (D. Colo. May 28, 1998) (citing *United States v. Strong*, 79 F.3d 925, 929 (9th Cir. 1996)). Indeed, in *Bartels*, the Court noted that:

> Some evidence must be presented to show that the activity or service was commercial in nature—i.e., for money or other consideration. Otherwise, § 261.10(c) would prohibit a friend, relative or neighbor from picking up horses for a third party. There is no question that § 261.10(c) is not directed at friends or relatives. It is directed at the [party] who is profiting [directly] or indirectly from the service or activity.

*Id*.

The advertisement and marketing campaign with which Defendant embarked, beginning with the Keystone Resort photographs, was one that relied upon social media trolling as a way to stir up controversy and free press while using NFS lands as the location or backdrop because as a small business, he was "not getting noticed being super 'eco this' and 'eco that.'" In the ever-growing lexicon of internet lingo, a troll is defined as "an online user who purposefully posts provocative, offensive, or insulting speech in order to draw a reaction from others." Fernando L. Diaz, *Trolling & the First Amendment: Protecting Internet Speech in the Era of Cyberbullies & Internet Defamation*, 2016 U. Ill. J.L. Tech. & Pol'y 135, 137 (2016). While the Government did not challenge the authenticity of the Hanging Lake and Maroon Lake posts, these posts are relevant under Federal Rule of Evidence 404(b)(2) for proving motive, opportunity, and intent.

Defendant assisted the Government in proving his motive, opportunity, and intent when he stated in The New Yorker article "[t]he more hate I got, the more people got behind me, from all over the world . . . It was an opportunity to reach a whole new group of people—while really solidifying the customer base we already had." And Defendant confirmed as true and accurate the statement in the article that noted that "Lesh declined to reveal Virtika's annual sales, though he claimed they were up thirty per cent since he'd posted the photo at Hanging Lake; he said he owns the company outright and carries very little debt." Thus, the Court finds that Defendant's activity

11

while trespassing at the Keystone Resort was commercial in nature and that the activity was on lands encompassed by the regulation and without a special use authorization.

Regardless, even without considering these admissions by Defendant, the Court could still find that Defendant's actions were commercial in nature. Commercial use or activity is defined as "any use or activity on National Forest System lands (a) where an entry or participation fee is charged, or (b) where the primary purpose is the sale of a good or service, and in either case, *regardless of whether the use or activity is intended to produce a profit*." 36 C.F.R. § 261.2 (emphasis added). And still photography is defined as the "use of still photographic equipment on National Forest System lands that takes place at a location where members of the public generally are not allowed or where additional administrative costs are likely, or uses models, sets, or props that are not a part of the site's natural or cultural resources or administrative facilities." 36 C.F.R. § 251.51. Indeed, filming and photography on NFS lands have been found to be commercial activities falling within the scope of 36 C.F.R. § 261.10(c). *See United States v. Patzer*, 15 F.3d 934, 938 (10th Cir. 1993) (affirming a conviction under §§ 251.50 and 261.10(c) for engaging in commercial service, outfitting, and filming motion pictures on NFS lands without special use authorization); *United States v. Lewton*, 575 Fed. Appx. 751, 753 (9th Cir. 2014) (affirming a conviction under 36 C.F.R. §261.10(c) for engaging in the commercial activity of filming bighorn sheep for profit without special use authorization). Because Defendant's still photography at the Keystone Resort was a commercial use or activity, he was required to seek special-use authorization, such as a "written permit, term permit, lease, or easement that authorizes use or occupancy of National Forest System lands and specifies the terms and conditions under which the use or occupancy may occur." 36 C.F.R. §§ 251.51, 261.2. Having failed to do that, and then posting the photographs on Instagram, this Court finds that Defendant was engaged in a work

activity or service in violation of § 261.10(c).  Either way, this Court finds beyond a reasonable doubt that on or about April 24, 2020, through October 21, 2020, Defendant sold or offered for sale any merchandise or conducted any kind of work activity or service without authorization by Federal law, regulation, or special-use authorization in the Keystone Ski Area within the White River National Forest.  And, ultimately, this Court does not need to decide if the regulations contain a *mens rea* requirement as the "evidence supports an inference [Defendant] knew he was on Forest Service land" while at the Keystone Resort.  *United States v. Brown*, 200 F.3d 710, 715 (10th Cir. 1999).

III.     CONCLUSION

Accordingly, I find beyond a reasonable doubt that on or about April 24, 2020, Defendant possessed or operated an over-snow vehicle in the Keystone Ski Area, outside of the roads, trails, and areas designated for over-snow vehicle use on the winter motor vehicle use map for the Dillon Ranger District of the White River National Forest and that Defendant's conduct did not fall within any of the regulatory exemptions (count 1).  Consequently, I find Defendant GUILTY of violating 36 C.F.R. § 261.14.

Furthermore, I find beyond a reasonable doubt that Defendant on or about April 24, 2020, through October 21, 2020, sold or offered for sale any merchandise or conducted any kind of work activity or service in the Keystone Ski Area within the White River National Forest without authorization by Federal law, regulation, or special-use authorization (count 2).  Consequently, I find Defendant GUILTY of violating 36 C.F.R. § 261.10(c).

IT IS FURTHER ORDERED THAT:

(1) On or before **November 15, 2021**, the Government shall file any request for restitution, if any is sought. This request shall state, with specificity, the amount sought and what this amount would pay for. Defendant shall respond to the Government's restitution request within **fourteen days (14)** thereafter. Defendant shall state, with specificity, any amounts agreed to and any amounts in disagreement. Within **ten days (10)**, the Government shall reply to Defendant's response. If either party believes that a contested hearing is needed on the issue of restitution, they shall so state in their written filing (the Government may so state in their reply after finding out if the Defendant disputes any amount) and include for the Court an estimated time for the length of such hearing.

(2) The Court will later set a sentencing date after the parties have determined whether restitution is at issue.

(3) A final judgment will not enter until the date of sentencing, with the time for appeal commencing on that date.

Dated at Grand Junction, Colorado this October 22, 2021.

_____
Gordon P. Gallagher
United States Magistrate Judge